The plaintiff brings this action to recover damages for ponding water on her land, located on South-West Creek. She alleges in her complaint, among other things: *Page 293 
"That the defendant is the owner of a mill-site known as `Kennedy's Mill' in said South-West Township, which said mill is built across South-West Creek below plaintiff's lands, and the defendant makes use of the waters of said South-West Creek to supply power for the operation of said mill.
"That on or about . . . . day of March, 1906, the defendant wrongfully, unlawfully, and without any rightful authority raised the dam of said mill about 3 feet or more over and above the height which he and the former owners of the said mill had maintained it before, and thereby raised the water in said creek, and caused same to overflow upon thefeme plaintiff's lands hereinbefore mentioned, to her great (363) damage and injury."
The plaintiff admitted on the trial that the defendant was entitled to maintain his dam at 10 feet 6 inches, and the controversy between them was as to the land between the water-mark with the dam at 10 feet 6 inches and the water-mark with the dam at 12 feet 2 inches.
The defendant contended that he was the owner of the land beyond the water-mark with the dam at 12 feet 2 inches high, and, if not the owner, that he had acquired the right to pond the water by prescription.
The plaintiff offered evidence tending to prove that prior to 1906 the dam was 10 feet 6 inches high, and that in that year it was raised to 12 feet 6 inches, and that water was thereby ponded on the land claimed by the plaintiff.
The plaintiff also offered a chain of title extending to 1869, and evidence that this title covered the land in controversy, and of adverse possession for a length of time sufficient to ripen color of title. It was admitted that the records of Lenoir County, except two old index books, were destroyed by fire in 1880.
The defendant offered in evidence deeds and other evidences of title, which, if admissible, traced his title to 1769.
Among other evidences of title, the defendant introduced a paper purporting to be a deed from Major Croom to Richard Caswell, of date 1772. The following certificate was on this paper:
I certify the above deed, probate, and enrollment to be true copies from the records of Lenoir County, this 12 March, 1851.
STEPHEN WHITE, Register.
Plato Collins was examined in reference to this paper, and testified as follows:
Q. How long have you been clerk of the court? A. Eleven years.
Q. Is it in evidence that Stephen White was register of deeds; have you ever seen any of his handwriting in his official capacity of register of deeds? A. I haven't seen the original records; they were destroyed; *Page 294 
(364) I have seen papers with Caswell's and White's signatures in a good many instances, certifying to the records when he was register of deeds.
Q. Have you seen that handwriting in his official capacity, purported and accepted as his handwriting? A. Yes, sir.
Q. You mean you accepted it as clerk? A. It has been presented to me as his handwriting and we accepted it as such; I have seen a good many of them.
Q. From what you have seen, can you form an opinion satisfactory to yourself whether these papers are in Stephen White's handwriting? A. Yes, sir; I have seen it frequently; it is the same handwriting.
Q. Will you look at that paper and say whether the certificate is in the handwriting of Stephen White? A. I think it is.
Cross-examined:
Q. Have you seen any of this handwriting that has been questioned before? A. No, sir.
Q. That was seen by people and accepted as his handwriting? A. Yes; they were presented to me by parties who held them, and accepted by me as his handwriting.
Q. In fact, you never saw any public records admitted to be in his handwriting? A. That matter was never brought in question by anybody.
Q. These papers were accepted by you and put on the public records? A. Yes, sir.
Redirect examination:
Q. Look at that paper and see what you think about it. (Hands witness paper.) Is that the same as that? A. Yes, sir; that purports to be Mayor Croom to Richard Caswell, certified 12 March, 1851.
Q. Will you look at that deed from Richard Caswell to Jesse Cobb, certified April, 1855; look at his signature? A. That doesn't look as much like it as the other; the characteristics of it are the same.
Q. In your opinion, are the handwritings on those papers in his handwriting? A. They have the same characteristics; I say it is the same handwriting that was purported to me to be in his handwriting.
Q. Also Jesse Cobb to John Cobb, certified 16 April, 1855; is (365) that the same handwriting? A. Yes, sir.
Q. You have said you have seen the writing of White when he was register of deeds in 1851; have you seen other writings of his? A. When I was a boy I saw receipts my father got when he used to trade with White, and we had been getting receipts; they got burned up when my father's house was burned up; they were in the same handwriting as these. *Page 295 
Q. From your recollection of the handwriting of Stephen White, are you able to form an opinion satisfactory to yourself that the signatures submitted to you are the handwriting of Stephen White? A. Yes.
Two other papers were admitted on the same evidence.
The plaintiff excepted.
In the chain of title introduced there was a deed from Jesse Cobb to John Cobb, of date 10 March, 1800, and the division of the John Cobb lands, of date 16 December, 1844.
In this division, under which the defendant claims, the land covered by the mill "to the high-water mark of the millpond" is allotted.
The deed to Richard Caswell and others called for land on South-West Creek.
E. P. Loftin, for the defendant, testified, among other things, that he had known the Cobb mill about 65 years; had lived about a mile or a mile and a half from the mill-house; that when he first knew the mill, old man Cobb was in charge, and, after his death, his son, Jesse Cobb; it was known as Cobb's mill; Johnnie Jackson had charge next; then Kennedy and Wooten; then Mr. Kelly; that he had known the boundaries of this land known as the Cobb mill land for fully 65 years; that he knows the present boundary of the high-water mark of the mill property, and that it is lower now than when the Cobbs had it; that he saw trees there above the island when he was a boy, and the water is about the same thing now; that there is a holly and the water does not come up as close as when he used to fish there; also a gum there that has high-water marks on it made with an axe, that are 12 to 14 inches above the present high-water mark; that the holly has marks or bruises on it, and that he had claimed his boat to the holly when fishing, at the (366) time Kelly had the mill; that the water now does not quite cover the island in the pond, and that he had seen it covered by water in times past; that the dam was old and worn down in 1851 and 1852, and that he does not think the water is as high now as it was then.
The defendant testified, among other things, as follows:
That he bought the mill from J. J. Jackson and rented it to J. C. Kennedy from year to year for 5 years; at the expiration of the time he sold it to J. P. Kelly and delivered to him in January, 1885. Kelly kept the mill for 18 years; then he bought it from Jackson, commissioner; J. C. Kennedy bought the half interest from J. C. Wooten, and the property was sold under that mortgage to pay that debt; bought it from Jackson; both J. C. Kennedy and J. C. Wooten are dead; J. C. Kennedy died about 16 or 18 years ago; Wooten died about the same time; that he has the deed to him from Mr. Jackson; that he was put in possession of what is known as the Cobb mills, the same property he owns now; that at that time the water of the pond was higher than it is now, and not *Page 296 
as high as he has seen it; at the time the west end of the dam and the road, in his judgment, was about as it was then, the Kinston end; some of the papers refer to it as the north side; it is a little northwest; on that end the road is about like it was then; the dam doesn't extend quite as far as the pond; this road on the Kinston side of the dam stops before it gets to the rim of the pond and the public road, and the natural level of the land for his part of the water of the pond; at that time the pond was about level with the road, but it was not running over it; then further down, where Cheney shows on the maps the little island, there are several projections, hummocks or tussocks; that is the point he has designated as a little island; the top of that shows, but the smaller ones do not show. They all show now. That he commenced to repair in the summer of 1905 and completed about 1 March, 1906. The water is lower than when he took charge; the Strawberry Branch run is in the center of Strawberry Swamp; at this point it turns towards the (367) island at right angles; when it reaches the upland there is a natural embankment there 14 inches or 2 feet; all along the run of Strawberry Swamp down to where you can see it on the swamp side of the embankment is cypress, gum, and such growth that grows in water on LaRoque's side of the run; on the embankment there is a growth that usually grows on uplands; that he saw only one dead pine, that looked to be dead 10 or 12 years to him; it is rotten; there is one small pine standing in water about 15 or 20 steps from the rim of high-water mark; the high-water mark seems to be along the bank of the stream; there is a slight line that runs along there which would indicate water has been there; and from the observation he made and the growth, the high-water mark used to be at least 12 inches higher; the holly and dogwood are right on the edge of the embankment; they are about 10 or 12 feet from the rim of the water; it slopes there gradually and a boat could not go within 20 or 30 feet of them now; that he noticed the bark of the trees; they looked like they had old bruises on them; observed a gum; it is in the same locality, but 25 feet from them; the gum is farther to the water; the water would have to rise a foot and a half to reach that; on the island they speak about he only saw one small pine that lies almost to the water; it didn't seem to be thrifty.
Jesse Evans, for the defendant, testified as follows:
Q. Where do you live? A. Dover.
Q. Are you acquainted with the Cobb mill? A. Yes, sir; I have known it all my life; when I first knew it, it was Cobb's mill; I am 55 years old.
Q. Will you state whether you have had any business relations there, and if so, what? A. I cut some timber, cypress, up the pond under Mr. *Page 297 
Kelly's instructions; that was 15 years ago; I made arrangements with Kelly on what they call Strawberry Branch and floated it down to the pond and put it at the pond, this end of the pond.
Objected to; objection overruled; exception.
The Court: I am admitting it to show the condition of the water up there.
Q. You say you floated it down on this end of the pond; what (368) is that end of the pond? A. I claim it is right along the road, where the waters come, what you might say is an open place.
There was other evidence on the part of the defendant as to marks on the land and trees, tending to show an old water line beyond the present one, and that the water had been ponded on the land continuously since 1850 or 1860, by the defendant and those under whom he claims, as far or further than at this time; and there was evidence to the contrary by the plaintiff.
His Honor charged the jury fully, to which there was no exception except as follows:
(a) "The plaintiff admits that the defendant is entitled to pond water on the land covered by water by a dam of 10 feet 6 inches, but that he is not entitled to pond water on the land covered by water between that height and the height of the water when maintained at 12 feet 2 inches."
The plaintiffs excepted to the foregoing portion of the court's charge.
(b) "The defendant introduces a deed in partition, dated 1844, the calls of which are for the high-water mark of the millpond; but the deed does not state the height of water in the millpond in 1844. The defendant claims title by possession, but does not show a grant from the State, but claims the same character of title that the plaintiff does. The defendant claims that the high-water mark mentioned in those proceedings of the Cobb mill, in partition proceedings, fixes the boundaries under which the defendant and those under whom he claims claim their title. Now, if you find the plaintiff has ripened her title, then you inquire where the defendant has a right and title or where he has been in possession. The defendant claims he has been in possession of the land up to the boundary known as the high-water mark. Now, the burden upon that question would be upon the defendant to show you by the greater weight of the evidence, or at least to your satisfaction, where that high-water mark is, either by the deed of partition or by some other deed, that the boundary is fixed and determined in some way." (369)
The plaintiffs excepted to the foregoing portion of the charge. *Page 298 
 (c) "So, then, it is a question for you to ascertain, whether the defendant has shown where the high-water mark is, either by showing you the height of the dam at the time the deed was made or where the high-water mark actually was."
The plaintiffs excepted to the foregoing part of the court's charge.
(d) "The defendant claims that you should answer the issue No; that the plaintiff is not the owner of any part of the land covered by water at the height of 12 feet 2 inches at the dam, nor any part of it; that he has proven to your satisfaction that he is entitled to the land covered by water at the height of 14 feet."
The plaintiffs excepted to the foregoing portion of the court's charge.
(e) "Now, the right of the defendant to pond the water back on this land might arise from two grounds: First, if the defendant owns the land covered by water by a dam up to 12 feet 2 inches, he has the right to pond the water back; and if you find that he owns it, then the question for you is, Has the defendant exercised the right continuously for 20 years to keep the water at 12 feet 2 inches? The defendant claims that he has the right to keep it back to where it is, and even higher, by reason of so keeping it for 20 years continuously, and that if he has that right, he has what is known as a prescriptive right and is entitled to the easement of 12 feet 2 inches. The defendant claims he has the right to maintain a dam at 14 feet, and that the dam has been maintained at 14 feet for more than 20 years, or at least it has been ponded as high as it is now for 20 years continuously."
The plaintiff excepted to the foregoing portion of the court's charge.
(f) "The court charges you that if you find by the greater weight of the evidence that the defendant owned the land, then he would have the right to pond the water back as often as he pleased; also the (270) court charges you if he had the right to pond the water upon the land, and that right was acquired by prescription, then if he did it for 20 years continuously and ponded it back at a point at or above what it is now, and acquired that easement by 20 years' continuous use, he would still be entitled to maintain it."
The plaintiff excepted to the foregoing portion of the court's charge.
The jury returned the following verdict:
"1. Is feme plaintiff the owner and in possession of any part of the tract of land described in the complaint not covered by water ponded back by a dam at the height of 12 feet and 2 inches? If so, what part thereof? Answer: Yes, all above water at 12 — 2.
"2. Is feme plaintiff the owner and entitled to possession of any part of the land described in the complaint covered by water ponded back by a dam at the height of 12 feet and 2 inches? If so, what part thereof? Answer: No. *Page 299 
"3. Has defendant wrongfully injured plaintiff's land by unlawfully ponding water on plaintiff's land? Answer: No.
"4. What damages, if any, is plaintiff entitled to recover of defendant? Answer: None."
A judgment was rendered upon the verdict, and the plaintiff appealed.
After stating the case: The plaintiff objects to the admissibility of the deed to Richard Caswell, on two grounds:
(1) That the evidence of the clerk, Plato Collins, as to the handwriting of Stephen White, who was Register of Deeds of Lenoir County in 1855, is incompetent. This objection is fully met by the interesting and valuable opinion of Justice Hoke in Nicholson v. Lumber Co., ante, 59. In that case a certificate of survey of a land warrant, (371) dated in 1841, and signed by Ruel Windley, surveyor, was admitted in evidence on the testimony of John B. Respass, Jr., which was as follows:
Q. Do you know Ruel Windley's handwriting? A. I know it in this way: he raised my father and was very devoted to him, and often in looking over his papers, which I have now, my father would show me and say, "This is frandfather's [grandfather's] signature."
Q. Have you seen a great deal of that writing? A. Yes, sir. Since I have been surveying I have seen quite a lot of it. By family reputation, my great-frandfather [great-grandfather] was a surveyor, and my father was a surveyor.
A small map marked "A," was handed to witness, and he was asked:
Q. Whose handwriting is this if you know? A. That is Ruel Windley's, from the source of information I have.
By the Court: Q. Do you mean to say that somebody told you that that identical paper was in Ruel Windley's own handwriting? A. Not this one.
By counsel for defendant: Q. From the writing you have seen purporting to have been written by Ruel Windley, is that, or is it not, his handwriting? A. Yes, sir; that is his handwriting.
And the Court, in speaking of this evidence, says:
"On these facts and accompanying testimony, we are of opinion that the plat with the certificate was properly received in evidence, being admissible as an ancient document, and also by reason of competent testimony tending to show that the certificate just below the plat and giving the corners of same, was signed or subscribed in the handwriting *Page 300 
of Ruel Windley, deceased. . . . The means of acquiring the requisite knowledge to enable one to form and express an opinion as to handwriting has, in case of ancient documents, and of necessity, been extended to include a witness who, in the course of his duty, has had full opportunity and frequent occasion to observe and note the handwriting in other ancient documents, entirely free from suspicion, and states that he has thus been enabled to form a satisfactory opinion as to the (372) handwriting of the ancient document in question. 3 Taylor Evidence, Ames' Notes, 1229, 21; Chamberlain Best on Evidence, p. 231; Starkie on Evidence, sec. 521."
(2) That no evidence was introduced to locate this and other deeds.
This objection cannot be considered under an exception to the admissibility of the deed. If the defendant offered a certified copy of the deed, and identified the handwriting of the officer who made the certificate, it was competent evidence; and if afterwards he failed to locate the land, the defendant should have called the matter to the attention of the court by a motion to withdraw the deeds or by a request for a special instruction.
It is not, however, essential that evidence of location should come from witnesses for the defendant, or from living witnesses. The deeds may contain descriptions which, without the aid of extrinsic proof, may indicate where the property is situate.
In this case the witness described the locality minutely, and according to all the evidence there was an ancient mill on the land claimed by the defendant and on South-West Creek.
In the deed to Caswell and in the other deeds the land is particularly described, and is said to be on South-West Creek, and to include the grist-mill on said creek.
We think the deeds were properly admitted. We also think the evidence of Jesse Evans was competent, restricted, as it was, by his Honor.
The first exception to the charge cannot be sustained. We must assume that the judge correctly stated the admission of the parties, and if by inadvertence he did not, it ought to have been called to his attention at the time, and cannot be made the subject of exception for the first time in the case on appeal.
The other exceptions to the charge are upon the grounds:
(1) That there is no evidence where high-water mark was in 1844.
(2) That there is no evidence of an adverse possession by the defendant.
(373) (3) That there is no evidence of a user by the defendant that will confer an easement. *Page 301 
In our opinion, there was some evidence as to the location of the high-water mark in 1844, and of a user by the defendant for a sufficient length of time to confer an easement.
A fair interpretation of the evidence of the witness Loftin is that in 1851 the water was maintained higher than now, and that at that time the dam was old and worn down, and there is other evidence of marks on the trees and land, and of the changes in the land, which were properly left to the jury.
If the evidence of the defendant is accepted as true, and we must do so in considering the question whether there is evidence, there can be no doubt of a user under a claim of right for more than 20 years, which would be necessary to confer an easement.
The objection that there is no evidence of an adverse possession is based on the following statement of Chief Justice Ruffin in Green v.Harmon, 15 N.C. 161:
"The overflowing of land by an act not done on it, but by stopping a water-course below, on one's own land, is not an ouster of the owner from the land overflowed. There is no entry, which is necessary to make a disseizin. The remedy for the injury is not trespass, but an action on the case for the consequential damages. Howard v. Banks, 2 Bur., 1113. Hence, however long it may continue, it affords, of itself, only a presumption of a grant of the easement, and not of the conveyance of the land."
The principle declared is not applicable to the facts in this case, as according to all the evidence here the dam was on the land of the defendant and the water does not extend beyond the claim of the defendant.
It is, however, manifest, from an examination of the whole case, that it was not the purpose of the Court to declare that overflowing land, claimed under a deed, is not an act of adverse possession, as is shown by the concluding language of the opinion:
"Although cutting of timber and overflowing the land do not (274) amount, of themselves, to an ouster, yet, being done without the leave of the owner, they give character to the entry into another part, and also furnish evidence of it to the owner. The jury might fairly infer from it, not only that the defendant did claim the land, but that the lessor of the plaintiff knew he claimed it and was not a mere wrongdoer without color of title."
The case involves, almost entirely, questions of fact, and having been fairly tried, we cannot disturb the judgment.
No error. *Page 302 
DEFENDANT'S APPEAL IN SAME CASE.
THE defendant's appeal presents two questions.
Upon the coming in of the verdict, the defendant moved the court for judgment for the entire cost of the action, including the cost of the survey. The court declined to tax the cost of the survey against the plaintiffs, on the ground that one-half had been paid by each party as the survey proceeded, and the court stated that in his opinion the bill was exorbitant, and declined to allow it to be taxed in the bill of costs. Defendant excepted.
The defendant then moved the court to adjudge the cost of the action to be charged upon the separate real and personal estate of the feme
plaintiff, Nora A. LaRoque. The court declined to grant the motion, and the defendant excepted.
The record discloses that the cost and expense of the survey were advanced equally by the plaintiffs and defendant upon the demand of the surveyor, as the survey progressed, and at the time of the trial one-half of the cost of the survey had been paid by the plaintiffs and one-half by the defendant. The entire cost of the survey was about $750.
It is provided in section 1504 of the Revisal that the court may order a survey when the boundaries of land shall be drawn in question in any pending action, "and for such surveys the court shall make a proper allowance, to be taxed as among the costs of the suit."
(375) The amount of the allowance is within the discretion of the court, after considering the evidence as to the work done, but the judge cannot decline to act because he thinks the charges made by the surveyor are exorbitant.
The statute requires him to fix the allowance, and directs that it shall be taxed as costs.
The payments to the surveyor without an order were made by the parties at their own peril, and cannot control the action of the judge.
The defendant was not entitled to have the judgment for costs made a charge against the separate estate of the feme plaintiff. The ordinary judgment for costs was rendered against her, which was proper.
The cause is remanded, to the end that the allowance to the surveyor be fixed, and that it be taxed as costs to the use of the defendant; provided that in no event shall such amount to the use of the defendant exceed the amount he has paid.
Reversed.
Cited: S. c., 161 N.C. 461; Hardy v. Mitchell, ib., 353; Lupton v.Express Co., 169 N.C. 675. *Page 303